FILED

2015 Apr-22  PM 05:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DONUT JOE'S, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:13-CV-1578-VEH** |
| | ) |
| **INTERVESTON FOOD SERVICES,** | ) |
| **LLC d/b/a DONUT CHEF,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION

This case is now before the court on a motion for summary judgment ("the Motion") (Doc. 54), filed on January 15, 2015 by defendant Interveston Food Services, LLC ("Interveston"), the only remaining defendant[1] in this case. Interveston seeks summary judgment in its favor on the only remaining claims[2] in this case: the trademark infringement claims made against it by plaintiff Donut Joe's, Inc. ("Donut Joe's"). (Doc. 54). Donut Joe's responded to the Motion on February 5, 2015. (Doc. 65, Doc. 66), and also filed a Motion To Strike several pieces of Interveston's evidence. (Doc. 68). Interveston filed a reply brief to Donut Joe's response on

---

[1] Other defendants were dismissed by the court in earlier orders. (Doc. 35, Doc. 40, Doc. 43).

[2] All of the counterclaims asserted by Interveston were dismissed without prejudice on December 18, 2013. (Doc. 27).

February 19, 2015, (Doc. 69), as well as a Response In Opposition to the motion to strike. (Doc. 70). Therefore, the matter is now under submission.

## II.    STATEMENT OF MATERIAL FACTS[3]

### A.    Undisputed Facts

1.    The Origins Of Donut Joe's And The Donut Chef

In July 2009, Donut Joe's opened a shop in Pelham, Alabama that primarily sells donuts and coffee. Towards the end of 2010, Werner Beiersdoerfer and Michael Kenneth Flowers approached Donut Joe's President and sole shareholder, Richard Byrd, about potentially opening a Donut Joe's franchise. Beiersdoerfer and Flowers are members of Interveston.[4] Neither Beiersdoerfer nor Flowers had prior experience operating a restaurant. Beiersdoerfer's son, Brock Tyson Beiersdoerfer, was formerly a member of Interveston. Beiersdoerfer's explicit intent in placing his son as a member

---

[3]Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy. Most of this section is taken verbatim from the "Statement of Undisputed Material Facts" in Interveston's brief (Doc. 55) and the "Additional Undisputed Facts" in Donut Joe's response brief (Doc. 65).

[4] Donut Joe's seems to argue that Elaine Beiersdoerfer is or formerly was a member. (Doc. 66 at 3). Whether or not she is or formerly was member of Interveston is not relevant to any issue in this case, and so the court declines to address that dispute.

in Interveston Food Services, LLC was due to "the potential consequences and the legal action I faced at that time." Beiersdoerfer's son was installed as a member of Interveston as a "favor" to Beiersdoerfer, even though he "was never a part of the LLC as a functioning body." Beiersdoerfer did not have any membership interest in the LLC until December 2011, at the earliest, when his son resigned and transferred his interest to Beiersdoerfer for no consideration or reason.

On November 12, 2010, Beiersdoerfer and Flowers entered into a Confidentiality and Non-Disclosure Agreement with Donut Joe's. In February 2011, the parties entered into a Letter of Understanding with respect to Interveston's development of Donut Joe's shops in Alabama. Interveston then began the process of opening a Donut Joe's shop. Interveston initially investigated a location in Clanton, Alabama, but ultimately chose a location in Calera, Alabama.

Around May 2011, Interveston entered into a lease for space, obtained approval from the Shelby County Health Department, and obtained a building permit from the City of Calera, keeping Donut Joe's apprised of the progress via emails. (Ex. 6.) Interveston also obtained financing and purchased equipment for the Calera location, including "[t]ables, trays, chairs, mixers, ice machine, displays, refrigerators, ovens, [and] freezers." The build-out of the Calera store began in early June 2011 and, around June 14, 2011, Byrd met with Interveston at the Calera location to discuss the

3

build-out and go over the plans. The parties could not agree[5] on the final terms of a license arrangement, and their business relationship terminated at the end of June 2011. Because Interveston had already entered into a lease agreement, begun building out the space to accommodate a donut shop, and purchased equipment for the store, Interveston proceeded to open an independent donut shop in the Calera location.

After the business relationship between Donut Joe's and Interveston terminated, Byrd drove to The Donut Chef location in Calera while it was still under construction, saw a donut character painted on the wall of the store, and took photographs of the inside of the store. On August 2, 2011, Byrd sent an email relaying that Interveston was opening up a donut store and that he had taken photographs of the store in Calera. On August 28, 2011, Byrd purchased the domain name for the website TheDonutChef.com. On or about September 18, 2011, Interveston opened The Donut Chef store in Calera.

2.      The Marks

Interveston engaged Roger Meadows, a corporate communications professional who assists businesses in branding, to help design a name and a logo for the Calera donut shop. Meadows proposed a number of potential names and designs. Flowers

---

[5] The parties dispute whether Donut Joe's proposed final license agreement was different from terms previously agreed to by Interveston. (Doc. 55 at 3, Doc. 66 at 1). The details of their negotiations are not relevant to any issue in this case, and so the court declines to address that dispute.

initially wanted to use the name "DJ's Donuts and Java" to promote a musical theme for the shop, but Beiersdoerfer rejected it, and Meadows did not recommend it because he thought it was weak. Interveston also rejected one of Meadow's proposed logos on the basis that it contained the word "Joe." Ultimately, Interveston selected "The Donut Chef," one of the names proposed by Meadows. Meadows came up with the concept for The Donut Chef's logo. Interveston never showed the Donut Joe's marks to Meadows, and, in fact, Meadows had never seen the Donut Joe's logo before his deposition in this case.

Interveston registered The Donut Chef trademark with the Alabama Secretary of State on December 27, 2013. The mark consists of a personified doughnut character wearing a chef's hat along with the words "THE DONUT CHEF."[6] Color has not been claimed as a feature of the mark. Interveston is the sole owner of the "Donut Chef" marks. Interveston explicitly maintains the rights to all trademarks and dictates how licensee stores will use its marks. Under their licensing agreements, licensees receive the rights to use The Donut Chef's trademarks without alteration.

Donut Joe's owns two registered trademarks — the Donut Joe's name, registered with the United States Patent and Trademark Office ("USPTO") in July

---

[6] Inside its store, The Donut Chef has a variation on the mark that adds an apron, legs and feet, and arms and hands to the character. (Doc. 57-6 at 2).

5

2011, and the Donut Joe's logo, registered with the USPTO in July 2012. In the registration of the word mark, Donut Joe's specifically disclaimed the exclusive right to use the word "donut" apart from the Donut Joe's mark in conjunction with the sale of donuts and restaurant services. Donut Joe's logo mark consists of the stylized wording "DONUT JOE'S" and a design of a donut wearing a chef's hat and holding a cup of coffee, on an oval shaped background carrier, above a smaller oval background carrier containing the words "Fresh Coffee & Donuts To Go!" Donut Joe's considers its corporate colors to be orange, green, brown, and white, and the inside of its store utilizes these colors.

The Donut Chef's primary colors are red, yellow, and brown. The inside walls of The Donut Chef store are painted yellow and include a picture of its donut character.

### 3.    Business Practices, Advertising, And Locations

Donut Joe's sells specialty coffees and considers its offering of coffee to be comparable to a Starbucks. Donut Joe's also sells prepackaged coffee in specialty flavors with Donut Joe's branding. The Donut Chef does not sell any specialty coffee. It does not currently sell any prepackaged coffee. When it did, it sold a Royal Cup brand and the packages never had The Donut Chef name or logo on them. The Donut Chef makes its own glaze for its donuts, while Donut Joe's does not. Also, one of The

Donut Chef's specialty products is beignets, which Donut Joe's does not sell. The Donut Chef also sells Italian Ice and sorbet, while Donut Joe's does not.

Donut Joe's puts its logo on all of its boxes and cups. The Donut Chef does not place its logo on its boxes and cups; instead, The Donut Chef boxes simply say "you deserve a donut." Donut Joe's sells plastic gift cards that are green and orange with the Donut Joe's logo, while The Donut Chef only offers generic paper gift certificates, with its name but no logo.[7] The Donut Chef is located in a brick building within a shopping center and has a drive-through window. (Ex. 28 at 2.)

Donut Joe's is located in a stand-alone building with a green roof and does not offer a drive-through window. Donut Joe's advertises through paid advertisements on Facebook and "on and off" with radio commercials. The radio commercials are pre-recorded ads that run approximately three times a week. Donut Joe's also has a website at DonutJoe's.com. On average, Donut Joe's has spent approximately $3,712.13 per year on advertising.[8]

---

[7] Donut Joe's disputes this, saying "The Donut Chef offers paper coupons featuring a doughnut character." (Doc. 66 at 10). However, the exhibit (Doc. 56-14) cited by Donut Joe's for support does not show a coupon or gift certificate. Rather, it is The Donut Chef's certification of Alabama trademark registration. Def. Ex. 32 (Doc. 57-10) supports Interveston's characterization of its gift certificates as including "a name but no logo." (Doc. 55 at 15).

[8] Donut Joe's says, in response to this entire paragraph, "Admitted in part, denied in part." (Doc. 66 at 11). It is the party's obligation to explain which statements of fact it considers objectionable. This vague response leaves the court is unable to discern which statement(s) of facts it admits, and which statement(s) it objects to, and so the entire paragraph is considered to be admitted by Donut Joe's.

Interveston does not currently engage in any paid advertising. It has previously purchased space in a Calera monthly newspaper, and, in 2013, it utilized a one-time, three-hour live radio spot. Although Interveston has a Facebook page for The Donut Chef, it does not pay for advertising on Facebook and it does not have a separate website. From 2011 to 2013, Interveston spent on average $1,572 for advertising. Donut Joe's typically has more than 1,000 customers per week.

**B.     Disputed Facts**

The parties dispute the number of franchisee stores that Donut Joe's has. (Doc. 66 at 12 ¶ 31; Doc. 69 at ¶ 31). The evidence cited by the parties unambiguously establishes that, in addition to the original Donut Joe's in Pelham, there are two franchisee stores: in Bessemer and in Gardendale. (Doc. 56-1 at 13; Doc. 60-1 at 10-11). According to interrogatory responses (Doc. 60-1 at 11) dated January 24, 2014 and Byrd's deposition (Doc. 56-1 at 38), conducted on August 24, 2014, Donut Joe's planned to license another location, in Cullman. (Doc. 56-1 at 38; Doc. 60-1 at 11). The evidence on record does not show the progress of those plans.

The parties also dispute the number of stores run under the name "The Donut Chef." (Doc. 66 at 12 ¶ 33, Doc. 69 at 2 ¶ 33). Donut Joe's cites Beiersdoerfer's deposition testimony (on August 25, 2014) that there are four "current Donut Chef locations," in Calera, Alabaster, Helena, and Columbiana. (Doc. 56-2 at 17-18).

8

Interveston disputes this and contends that it only operates one store. (Doc. 69 at 2 ¶ 33). However, the only support it cites is a footnote to its own statement of material facts, which says "Interveston later opened The Donut Chef locations in Clanton, Jemison, Columbiana, and Alabaster and licensed the name for locations in Chelsea and Helena, all of which operated for short periods of time. Currently, The Donut Chef only operates in the Calera location." (Doc. 55 at 5 n.1). However, statements in a brief are not evidence, and Interveston cites no other source to show that those stores are no longer in operation. Therefore, the court decides this motion under the assumption that there are currently four Donut Chef locations in operation.

Finally, the parties dispute how many reported instances of consumer confusion have taken place. According to Donut Joe's, it "has encountered no fewer than seven reported instances of reported consumer confusion." (Doc. 66 at 6). Interveston disputes this number, but after denying Donut Joe's claim of seven instances does not make a counterassertion regarding the number of instances of consumer confusion. (*See* Doc. 69 at 2).[9] Interveston points to its brief for the Motion, which appears to deny that <u>any</u> instances of consumer confusion occurred. (*See* Doc. 55 at 36 ("Here,

---

[9] Interveston also objects to Donut Joe's statement of fact on the ground that "it is a legal conclusion." (Doc. 69 at 2). This is incorrect. Instances of actual consumer confusion are considered as one factor under the test for likelihood of consumer confusion. However, while <u>likelihood of consumer confusion</u> is a legal conclusion, whether or not particular consumers were confused is a factual matter.

there is no evidence that any customer purchased a product from The Donut Chef thinking that it came from Donut Joe's.")) . Having considered the evidence (Docs. 55-1 at 15-18, 57-18, 57-19, 57-20, 58, 59, 60-1) in the light most favorable to the nonmoving party, as is required at summary judgment, the court finds evidence that five named individuals[10] reported confusion between the two companies. Some unknown number of unnamed individuals also reported confusion. (Doc. 59 at 3).

## III.   STANDARDS

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R . CIV. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita*

---

[10] Jeff Crooks, Alexandra Ayala, Katrina Brown, Barbara Bartley, and Sandra Lanter.

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

## B. Trademark Infringement Generally

"A trademark is 'any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citation omitted). "To establish a *prima facie* case in an ordinary trademark infringement suit, a claimant need only demonstrate that: (1) it enjoys enforceable rights in its mark, and (2) the alleged infringer adopted a mark that is the same or confusingly similar." *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996) (citing *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512 (11th Cir.1984)); *see also International Stamp Art*, 456 F.3d at 1274 ("'A plaintiff seeking to prevail on a trademark infringement claim must show (1) that he had a valid trademark and (2) that the defendant had adopted an identical or similar mark such that consumers were likely to confuse the two.'") (citation omitted).

## IV. ANALYSIS

### A. Trademark Validity

#### 1. The Plaintiff's Marks Are Descriptive

A plaintiff has a protectable interest in a mark if the mark is inherently

distinctive. *Investacorp Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1522 (11th Cir. 1991). If the mark is not inherently distinctive, a plaintiff can obtain rights in the mark only if the mark acquires secondary meaning. *Id.*

When determining distinctiveness, the Eleventh Circuit classifies a mark as either arbitrary, suggestive, descriptive, or generic. *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). An arbitrary mark is one that bears no relationship to the service provided by the mark owner (e.g., "'Sun Bank' is arbitrary when applied to bank services"). *Id.* A suggestive mark suggests the service but requires "an effort of imagination by the customer" to make the connection between the mark and the service (e.g., "'penguin' would be suggestive of refrigerators"). *Id.* A descriptive mark identifies a characteristic or quality of a service (e.g., "'vision center' would be descriptive of a place where glasses are sold"). *Id.* Finally, a generic mark merely states the basic nature of the business (e.g., "liquor store" would be generic when used in connection with the sale of liquor). *Id.* An arbitrary or suggestive mark is eligible for protection, while a generic mark is not. *Investacorp*, 931 F.2d at 1522-23. A descriptive mark is protectable only if it has acquired secondary meaning. *Id.*

In this case, plaintiff Donut Joe's has two marks that it alleges were infringed. (*See* Doc. 1 at 4). The first is the word mark "Donut Joe's." (Doc. 1-2). The second

12

is its logo, which contains the words "DONUT JOE'S Fresh Coffee & Donuts To Go" along with a circular, anthropomorphized donut character smiling and wearing a chef's hat. (Doc. 1-3).

Donut Joe's sells primarily coffee and donuts. The word mark "Donut Joe's" is a descriptive mark. Because the store sells donuts and coffee, and "joe" is a colloquial name[11] for coffee, the mark clearly has some relationship to the goods provided by Donut Joe's. Therefore, the mark is not arbitrary. Furthermore, it does not require any effort of imagination to draw the connection between the name "Donut Joe's" and the fact that the store sells donuts and joe, i.e. coffee, and so the mark is not suggestive. As between descriptive and generic, "Donut Joe's" is better classified as descriptive, since it conveys the business of the company without being a perfectly straightforward reference to the goods sold, unlike, say, "Donuts and Joe," which would be a generic mark. *Cf. Investacorp*, 931 F.2d at 1524 (11th Cir. 1991) (finding "Investacorp" to be a descriptive mark because "the two formatives combined in the term 'Investacorp' literally convey to the observer that appellant is in the business of investing in corporations.").

The court finds that the same analysis applies to the Donut Joe's logo. The

---

[11] *See*, e.g., Merriam-Webster Dictionary entry "joe," available at http://www.merriam-webster.com/dictionary/joe.

evaluation is slightly more complex because it is a combination of words and an image, but, in this logo, the words "DONUT JOE'S" dominate a viewer's first impression. This suggests the same categorization as the word mark. The other elements in the logo—"Fresh Coffee & Donuts To Go" and the anthropomorphized donut character—do not make the connection between the mark and the store's goods any less straightforward; if anything, adding those elements makes it even more clearly descriptive of the store's goods.

2. The Marks Have Not Acquired Secondary Meaning

A descriptive mark is only protectable if the plaintiff can establish a secondary meaning. *Investacorp, Inc.*, 931 F.2d at 1524. "Secondary meaning is the connection in the consumer's mind between the mark and the provider of the service." *Id.* at 1525. The plaintiff has "the burden of sustaining a high degree of proof in establishing a secondary meaning" for a descriptive mark. *Id*. If there is no proof of secondary meaning through consumer survey evidence, courts generally consider four factors to determine whether a particular mark has acquired secondary meaning: (1) length and manner of the mark's use; (2) the nature and extent of the plaintiff's advertising and promotion; (3) the plaintiff's efforts to promote a conscious connection in the public's mind between the mark and the plaintiff's business; and (4) the extent to which the public actually identifies the name with the plaintiff's business. *Id*.; *Welding Servs.,*

*Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007). "Secondary meaning must attach to the mark before [the alleged infringer] first used the [allegedly infringing] mark." *Investacorp*, 931 F.2d at 1525.

In this case, there is no consumer survey evidence on Donut Joe's marks, and so the court will consider the four factors. First is the length and manner of use. The marks were used in a typical manner: displayed on the outside and inside of the building, and on the store's boxes and cups. Donut Joe's opened in July, 2009 (*see* Doc. 57-13 at 1), so the marks were used for about two years before Interveston first made use of the Donut Chef marks in September, 2011. (Doc. 56-1 at 7; Doc. 56-15; Doc. 56-16). This circuit's case law suggests that two years is insufficient for secondary meaning to attach. *Compare Investacorp*, 931 F.2d at 1525 (upholding trial court finding of no secondary meaning where plaintiff had used mark for <u>five</u> years) *and Aloe Creme Labs., Inc. v. Milsan, Inc.*, 423 F.2d 845, 847-850 (5th Cir. 1970) (upholding finding of no secondary meaning after <u>twelve</u> years of use), *with Conagra*, 743 F.2d at 1513 (11th Cir. 1984) (ruling that secondary meaning had attached to a descriptive mark after 25 years of use).

During that time period, Donut Joe's spent a total of only $5,444.17, about $200 per month, on advertising and promotions. (Doc. 57-13). There is no evidence that Donut Joe's took intentional efforts to promote a conscious connection in the public

15

mind between its marks and its business. Neither of these factors supports a finding of secondary meaning. *Compare Investacorp*, 831 F.2d at 1526 (no secondary meaning where trademark holder spent about $100 per month in advertising and had no evidence of intentional efforts to create awareness of its mark among consumers) *with Conagra*, 743 F.2d at 1513 (ruling that secondary meaning had attached where plaintiff spent over $400,000 annually on promotion of its name and made a promotional film tying its name to its products that was displayed to brokers and retailers for over three years).

As to evidence of actual identification, the most to which Donut Joe's could point is evidence of a handful of incidents where customers inquired about a relationship between the two companies after seeing The Donut Chef's marks. However, this evidence concerns only five customers, and so is not sufficient to present a genuine issue of material fact as to secondary meaning. *See Investacorp*, 931 F.2d at 1526 ("the few isolated instances cited by appellant are not adequate to present a genuine issue of material fact" as to secondary meaning); *Vision Ctr.*, 596 F.2d at 119 (holding that the testimony of seven customers regarding their identification of plaintiff's mark with plaintiff's business and evidence that one of the defendant's customers believed the parties to be associated was insufficient proof of actual identification).

16

The plaintiff explicitly declines to offer argument that its marks acquired secondary meaning. (Doc. 66 at 19). Donut Joe's states this is "unnecessary" (*Id.*), because it is "entitled to the presumption of valid and protectable marks, as provided by the Lanham Act, because it possesses two trademark registrations." (*Id.* at 10). Essentially, Donut Joe's argues that the <u>fact of registration</u> prevents a summary judgment that its marks are not protectable and <u>automatically</u> creates a question of fact for trial. (*Id.* at 10-19).

This argument misconstrues the effect of registration. The former Fifth Circuit stated that the presumption of validity for registered marks "is rebuttable and may be overcome by establishing the generic or descriptive nature of the mark." *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979). The court has been unable to find any Eleventh Circuit case on point, but the Fifth Circuit, relying on *Vision Ctr.* as precedent, specifically rejected the argument that registration alone precludes summary judgment. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 239

(5th Cir. 2010). Several other circuits[12] and at least one district court[13] in this circuit have also rejected the argument that registration automatically creates a triable issue of fact. The court agrees with this weight of persuasive authority, and holds that, in this case, the presumption of validity has been rebutted by the lack of evidence that Donut Joe's marks have acquired secondary meaning.

## B.   There Is No Likelihood Of Consumer Confusion

The court has concluded that summary judgment should be granted due to the plaintiff's mark's lack of secondary meaning. Even if the marks were protectable, summary judgment would be due to be granted at the second stage of the trademark infringement analysis. The plaintiff in a trademark infringement suit bears the burden of proving that the defendant's mark is likely to cause consumer confusion. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004) (the "burden of proving likelihood of confusion rests with the plaintiff"). The hypothetical consumers in question are "reasonably prudent buyers." *John H. Harland Co. v.*

---

[12] *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 543-44 (4th Cir. 2004); *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 708 (1st Cir. 2007); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002); *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 940 (7th Cir. 1986); *see also Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397 (6th Cir. 2002) (affirming summary judgment on the grounds that plaintiff's federally registered trademark was generic).

[13] *Thoroughbred Legends, LLC v. The Walt Disney Co.*, No. 1:07-CV-1275-BBM, 2008 WL 616253, at *8 (N.D. Ga. Feb. 12, 2008) (holding that "registration of [the mark] creates a presumption of validity . . . [that] is easily rebuttable, since it merely shifts the burden of production to the alleged infringer.") (internal quotation marks omitted).

18

*Clarke Checks, Inc.*, 711 F. 2d 966, 979 n.22 (11th Cir. 1983).

To determine whether a likelihood of confusion exists, the Eleventh Circuit looks to seven factors: "(1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to [infringe]; and (7) the existence and extent of actual confusion in the consuming public." *Tana v. Dantanna's*, 611 F. 3d 767, 775 (11th Cir. 2010). The test requires an evaluation of the "overall balance" of the factors. *Custom Mfg.*, 508 F.3d at 649. The first and last factors — strength of the mark and existence of actual confusion — are the most important. *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1186 (11th Cir. 1985).

Several of the factors weigh in favor of a finding a likelihood of consumer confusion. There is strong similarity between the goods sold by the two parties; both sell mainly coffee and donuts, along with a few other items. There is some similarity in the parties' sales methods, since both sell exclusively out of their own retail stores, and apparently in customer base as well, since Donut Joe's reports several instances of customers visiting its store who were aware of The Donut Chef. The second factor — similarity of the marks — weighs, at most, only slightly in favor of the plaintiff.

19

The two word marks — "Donut Joe's" and "The Donut Chef" — are not similar in their <u>protectable</u> elements.[14] The logos have some similarity due to their inclusion of donut characters — both are smiling, wear a chef's hat, and have stick-like arms and leg — but in considering the similarity of the marks, the court must analyze each mark as a whole, rather than comparing individual features. *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1507 (11th Cir. 1985). Other aspects of the logos differ significantly: differing placements of the donut  characters relative to the words, Donut Joe's mark's inclusion of an additional phrase ("Fresh Coffee & Donuts To Go!"), and the presence of colored oval background shapes behind the words in Donut Joe's logo as opposed to the absence of shapes in The Donut Chef's.

Two of the factors have little weight in our case. There is no evidence of intent to infringe on the part of Interveston. Donut Joe's comes closest to raising a question of fact as to Interveston's intent to infringe is when it points out that one member of Interveston originally suggested "DJ's" and "Donuts and Joe" when selecting a name and that this idea was rejected due to concerns of trademark infringement. (*See* Doc.

---

[14] The fact that both parties' marks include the word "donut" has little relevance for the purposes of this analysis, as it is a generic reference to one of the products sold by both parties under the mark. *See Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1183 (11th Cir. 1985) (use of an identical word has little weight in the "similarity of mark" analysis if that word is "weakly protected"); *Alltel Corp. v. Actel Integrated Commc'ns, Inc.*, 42 F. Supp. 2d 1265, 1271 (S.D. Ala. 1999) (stating that because the suffix "tel" is commonly associated with the telecommunications industry, "that similarity is of minimal importance").

66 at 27). Donut Joe's says that this shows that Interveston "was aware that its brand was almost too similar to Donut Joe's." (*Id.*). However, while this story might raise questions as to whether that <u>one member</u> of Interveston had an intent to infringe, it suggests that Interveston, <u>as a corporate entity</u>, intended to <u>avoid</u> possible infringement on Donut Joe's mark. The other factor that has little weight in this case is the similarity of advertising. Interveston has not engaged in a significant degree of advertising — it currently pays for no advertising and has no website other than a Facebook page for The Donut Chef — and so there is little basis for comparison of the parties' advertising.

However, there are decisive grounds for awarding summary judgment on the question of likelihood of consumer confusion due to the first and last factors, which are the most important of the seven factors. *Freedom Sav. & Loan Ass'n*, 757 F.2d at 1186. The first is the strength of the mark. As discussed in the previous section, both of Donut Joe's marks are descriptive and lack secondary meaning. This entitles them to less protection than arbitrary and suggestive marks. *Welding Servs.*, 509 F.3d at 1361. The marks are further weakened due to widespread third-party use of the elements of Donut Joe's marks, another factor that courts take into account when judging the strength of the mark. *See, e.g., John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983) (third party use is one factor that "should be

considered when analyzing the strength of a particular trademark"). A search of the Alabama Secretary of State website's business entity database[15] contains 35 currently existing Alabama businesses that include the word "donut," along with 45 defunct entities. (Doc. 57-16). The same database shows 23 currently existing businesses that use the term "Joe's" or a related term (such as "joes"). (Doc. 57-17). Extensive use of the component terms of Donut Joe's marks by other parties is additional support for the conclusion that the marks are weak.

The last factor — evidence of actual consumer confusion — also undercuts Donut Joe's claim. As discussed *supra*, III.B, the evidence, read in the light most favorable to the plaintiff, shows only five instances of consumer confusion over the three-year period between when Donut Joe's opened (September, 2011) and the end of the discovery period (September, 2014). According to one of Donut Joe's corporate representatives, the company serves at least one thousand customers per week. (Doc. 56-1 at 13). Therefore, these instances of consumer confusion are negligible and give no basis for concluding that there is a likelihood of consumer confusion. *See Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 319 (5th Cir.

---

[15] The plaintiff objects to the use of this database in the Motion To Strike, arguing that it is irrelevant because "Alabama has a separate state-level trademark registration system." (Doc. 68 at 2). Although evidence from the trademark registration system would likely be more relevant than evidence from the business entity database, this evidence still has relevance on account of its tendency to demonstrate that other businesses in Alabama use the words "donut" and "joe's" in their names.

1981) (holding that nineteen reports of consumer confusion over a three year period was a "negligible" "amount of past confusion.").

Having considered all seven factors, it is clear that a reasonable jury could not conclude that there is a likelihood of consumer confusion resulting from Interveston's use of its marks. This provides an additional basis for summary judgment to be granted in favor of Interveston on Donut Joe's trademark infringement claims.[16]

## IV.   CONCLUSION

For all of the forgoing reasons, the Motion is due to be **GRANTED** as to all of Donut Joe's claims. The court will enter a separate final judgment order consistent with this memorandum opinion. Since summary judgment will be granted to Interveston, Donut Joe's motion to strike (Doc. 68) is due to be and hereby is termed **MOOT.**

**DONE** and **ORDERED** this the 22nd day of April, 2015.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[16] Because the court has concluded that summary judgment is due on two grounds — Donut Joe's marks were not protectable and there is no likelihood of consumer confusion — it will not reach Interveston's additional arguments that Donut Joe's cannot prove damages and that laches bars the claims. (Doc. 55 at 35-40).